The first case is Freeman United Mining v. Workers' Compensation in Valley 510-0124. Counsel, please. May it please the court, my name is Ken Wirtz and I represent the appellant, Mr. Wessore. Welcome, Justice Scoop. I've seen you. I hope I didn't scare Justice Holderjob. No, but I've noticed you have a trait that I think some of the rest of us have picked up. That is, you've gained a little weight. But that's not in the record. I don't think anything could have been said or asked that would have been any more cruel than that. Please proceed. Your Honors, this is a 19-H petition that I'm here on. Well, excuse me, I have to say one other thing. Judge Holdridge is not able to be here for this case. He is a member of the panel, not able to be present for the oral arguments. He has had the benefit of reviewing the briefs in these cases. He's had the benefit of reviewing the record. The oral arguments presented today will also be reviewed by him because they are tape-recorded. And although he's not present today, he will be an active participant in the decision-making process in this case. Thank you. This claim comes to you on a denial by the Commission of a Section 19-F petition that asks the Commission to determine whether the claimant's disability had recurred, increased, diminished, or ended. The claim itself is an occupational disease claim. A wage differential was originally made in this case. When I looked at it, I couldn't tell from the things that I looked at. When was the 8-D-1 upheld on appeal and was it? Your Honor, it went all the way here. And a Rule 23 order was issued in that case. And I don't recall the date off the top of my head. My notes show that it was upheld. I guess my question was the next one. When was the 19-H filed? The 19-H was filed within 30 months. Your Honor, I'm not certain. I would have to look at my brief. Oh, that's all right. You've answered the question. There is not an issue about the 30-month requirement in this case. The Commission heard the 19-H petition and denied saying, citing Petrie versus the Industrial Commission, which Your Honors are very familiar with. In that case, the Appellate Court had to struggle with the definition of disability in evaluating the 19-H petition. And ultimately, the Court in Petrie held that the term disability meant physical or mental disability, not economic disability. Petrie was a workers' compensation claim, not an occupational disease claim. From what I can tell, and looking at the opinion in Petrie and everything that I could gather on what happened there, it appears that the parties never pointed out to the Court that there, in fact, was a definition of disability, that it was in the Occupational Disease Act, the Sister Act. I'm fairly confident that that was not done by the parties, because I feel that the Court then would have had to have addressed the fact that disability was defined in the Occupational Disease Act, and yet then chose to define it differently in the work content. As you know, the Occupational Disease Act specifically defines the term disablement and disability in Section 1E. And that definition includes economic disability. The award in this case was for economic disability. Because of that, my argument to the Commission was that they must consider economic disability in their analysis of the 19-H petition. And they quite clearly said no, Petrie controls. If this Court were to say now that Petrie controls in this case, you would be adopting, by doing so, a definition of disability that is contrary to that definition contained in the Occupational Disease Act. I don't think there's any getting around it. What was Clement's testimony as to why he left security? The job he assumed after he left Freeman Cole was for Securitas, as you say. And he was a guard. His testimony was that he had been told that there was going to be a job change for him. The job required him to drive approximately an hour to the site to work. He did not want to do that. He also, at the time, had a job where he was basically in a vehicle. It sounds like he was patrolling using a vehicle. The new job would have required him to patrol on foot, and he didn't feel like he could do that either. So he testified that he could not perform the job. He testified that he felt he could not, or did not want to do the walking, and did not want to drive from his home. And the Commission credited that testimony, did it not? The Commission denied the claim, the 19-F petition, on the basis that there had not been a change in his physical or mental disability pursuant to Petrie. The award in this case, Justice Hudson, was a wage differential based upon the diagnosis of black blood, not based upon any functional impairment. His giving up working at age 62, there is no evidence in the record that that was because of his earlier diagnosis of black blood. There's none whatsoever. The evidence is that because of that diagnosis, he couldn't work in a coal mine. That's where the economic disability came in. But there's no evidence that at this time, this gentleman has a wage loss, but for the fact that he ultimately decided to retire at age 62. The first hurdle that we have to get over here, I believe, is does disablement, in this case, we don't have to make a sweeping ruling here that would have an effect on Petrie as a work comp claim. But in this case, this occupational disease claim is economic disability, something that must be looked at in a 19-F petition. If that answer is yes, then I think there's sufficient facts in the record for you to rule as to whether that disablement has continued. The alternative would be, of course, to refer this back, to remand this back to the commission with instruction that they consider whether the disablement has ended by looking at disability as defined in the occupational disease act. Did I answer your question, Justice? In essence, yes. That's my argument. It's novel. I believe it's a case of first impression, dealing with the OD Act and 19-F. I have nothing more for you. I'll reserve the time I have left. Thank you, counsel. Thank you. If it pleases the court, Mr. Wirtz. My name is Bruce Besore and I represent Clarence Kelly. The first thing I need you to do is apologize for my cold and flu I've been struck with in the last 12 or 14 hours. That prevents me from articulating as clearly as I'd like and from hearing anything. You mean you would if you didn't have a cold? I'm not very good then either. And I'm getting fatter too. And if it pleases the court, I'd like to make that a continuing apology for the rest of my four arguments today. And also, if it pleases the court, the brief contains the legal intricacies of the arguments. It talks about the cases. That's been handled in the briefs a lot better than I can do standing up here. And what I'd like to do is confine my argument for about seven or eight minutes at the most to the practical implications of dreamless theory. When the commission made its ruling on Freeman's motion for modification, it did three things. It gave the practical considerations, its understanding of the statute, and its interpretation of the case law. Its decision was in keeping with the facts of the case, the act, and that case law. And the commission made three points. First, from the practical application of the law, the commission raised this question. If you don't have to have a job to get a wage differential in the first place, how could you be required to have a job to keep a wage differential? That common sense approach, I think, answers about everything in the case. And no matter how each word and phrase of the act is dissected and massaged, in the end, the practical application of Freeman's argument is what makes it unraveling. Second, the commission said that 19H of the OD Act is a mirror image, pardon me, 19H of the OD Act is a mirror image of Section 19H of the Work Compact, with the exception of the time frame allowed for reviewing the original award. And third, it said that the Petrie case applies and draws a bright line. And according to Petrie, the term disability in 19H refers to physical and mental disability, not to economic disability. And it noted that Petrie was heard under Compact instead of the OD Act. And the commission said that since both acts are substantially the same, the analysis of Petrie would hold true for an analysis of the OD Act too. The commission noted that Freeman has no case law to cite in its favor, and it denied the motion for modification. I like that, but every once in a while in these black lung cases, we don't have any case law because it's new. The complete practical analysis of Freeman's argument didn't work its way into our brief, and it wasn't in Freeman's brief, but it's an extension of the commission's analysis of the practical implications of Freeman's arguments. Freeman wants Mr. Gulley's wage differential end to cause his job with securities him. But in this case, Mr. Gulley's wage differential award didn't have anything to do with securities. His earning capacity was calculated by the commission based on his five years of employment with Brinks. In fact, when you read the decision, it's clear that Mr. Gulley would have gotten his wage differential at the exact amount he did and beginning at the time he did, whether he'd ever gone to work for securities or anybody else. The commission had a six-step analysis, and here's what it wrote. Number one, he left coal mining for health reasons at age 55. Two, while working as a coal miner, he made $802 a week. Three, the best job he could find after that was driving an armored truck for Brinks. That's $334 a week. Four, he can't safely return to mining, and as a consequence, these are the words of the commission, and as a consequence of that, he suffered impaired earnings and a wage differential is appropriate. Five, his mining weekly wage of $802 minus his next best earnings, $334 for Brinks, equals $468. Two-thirds of the difference of that is $312. And last, the commission finds that Petitia's entitled to a wage differential of $312 a week, commencing on his date of last exposure and continuing for the duration of his disability. So first, the commission drew the ballpark. He got the wage differential because he retired from mining for health reasons. Second, they defined the way they set out the two-step calculation to determine the loss of earning capacity. They compared his mining wage to his best wage after mining. That wasn't for securities, it was for Brinks. Third, they repeated the reason for the award. It's because he can't safely return to mining, and as a consequence, he suffered impaired earnings. And then fourth, they made the calculation, subtracting the wage for Brinks from the wage for mining, taking two-thirds of that. Next, the commission set out how long the wage differential would last. And in the case law, there's a lot about that, that at the initial determination of the wage differential, each party gets to present evidence about that duration. And that's a pretty important thing, and no other evidence was offered by either party in this case. It said, quote, the commission finds that Petitia's entitled to a wage differential, commencing March 8, 1997, and continuing for the duration of his disability. And in that definition and calculation are the keys to this argument. He got the award for health reasons. That means more than just having the disease of pneumoconiosis. He got the award despite the fact that he retired from mining at age 55. And his impairment of earnings was determined by deducting his best wage after that coal mining from his mining wage. Neither the reason for granting the wage differential, nor the amount of that wage differential, had anything to do with securities. It was all based on the Brinks' employment. And at the time that calculation was made, he'd been out of his Brinks job for two years. The commission said the wage differential would be at a rate of $3.12 per week from the time the disability began, the day he left mining, and continue for the duration of his disability. And it defined that disability. It said he can't return to mining for health reasons. So the duration would be until he can return to mining without health concerns. Now compare Freeman's argument. Compare that to Freeman's argument. Freeman wants to end that wage differential because he left securities. Even though securities employment didn't have anything to do with the wage differential. Freeman wants the wage differential to end because he voluntarily retired from the job of securities. Even though he got his wage differential initially. Despite the fact that he voluntarily retired from coal mining. And Freeman wants the duration of disability to end when he left securities, even though the securities job never had anything to do with the award, and even though neither the securities job nor the Brinks job, which was the post-mining employment that did set the amount, had anything to do with the disability. That's the reason for the award. The disability that got him his wage differential was health reasons. It kept him from returning to work as a coal miner. And a couple more notes. The reason he had to leave coal mining was the same reason he left securities. For health reasons. Except that at securities the functional impairment that made him quit was more clear. He couldn't do the work. If you recall from the testimony, in his earlier job at securities, he was driving a truck around a parking lot at Walmart in Maryland. He was in that truck, air-conditioned, heated, and that's all he had to do. Because he was low on the seniority totem pole, they wanted him to go up to Red Buck, which happens to be where I live, and guard that hospital. Twelve hour shifts, two consecutive days, walk around it. It's a three-story hospital. Not well staffed with securities. And also to guard the nursing home, which is a block away. And when a helicopter would come for an emergency situation, he'd have to run to the helicopter and clear that of anything that was in the way and set out the barricades so nothing could get in the way. And he said he could not do that. Mr. Whistler, is there any evidence presented in the record to contradict the claimant's testimony that he stopped working for securities due to his physical condition? Was there any contrary evidence presented to that? None whatsoever. And I think the logical implication is that the breathing problems he was experiencing when he left coal mining had progressed. That was his opinion. There's nothing to the contrary. And it's very logical to think that a man in his situation couldn't do this twelve hours of walking around the hospital and running in an emergency situation to the helicopter. So I think that, and I'm going to make this point, another practical look at what you're getting to at Freeman's argument is that under the facts of this case, Freeman's saying that Mr. Gulley's damaged earning capacity should disappear because his diseased lungs now prevent him from doing his new job duties too. It doesn't make much sense, but I think that's what it amounts to. It would seem that if the health reasons that gave you the wage intervention in the first place are now getting so bad you also have to leave your post-mining job, which is easier than mining, your benefits should go up, not go away. And I ask the court to affirm the denial of Freeman's petition. Thank you. Mr. Sorge. Justice Hudson, I'm going to pick up on the question you had for me as well as Mr. McSorge. The commission, by applying Petrie to the 19-F petition, which is clearly what they did, has said, by denying the 19-F petition, that there has been no material change in this gentleman's physical or mental condition. I don't agree that they should have limited their analysis to whether there was a material change in this gentleman's physical or mental condition, but they did, and they did not find a change, and that's law of the case in this case. The only analysis that now remains is should they also have looked at economic disablement, because that's the way the term is defined in the Occupational Disease Act. So my argument to you is that we cannot revisit whether he had a physical or mental change. If the case were remanded to the commission, they've already made that determination. They need to be instructed now to look at whether there's been a change in his economic disability. For you, collectively, I think the same holds true. You would have to look at whether there has been a change in his economic disability. That is my argument. Was there any evidence introduced by your client that there had been a change? I'm sorry? There had been a change in his economic disability? In his economic disablement? Yeah. We called him to testify. What did he say? What did he say about his economic disability? Well, he said, as Justice Hudson pointed out, and Mr. Wasore, that he was told he would have to be transferred to another job that was an hour away, that he didn't want to drive there and also it would require him to do foot patrol. And he was age 62 and he decided not to do it. Does that go to economic disablement or does that go to physical disablement? My point in regards to the physical disablement is the Commission has said there is. No, I understand that, but you're the burden party on this petition. What evidence did you introduce to establish that there had been a change in his economic disability? His testimony. What testimony? His testimony that he had taken a retirement, a voluntary retirement. At this point in time, he is, his wage loss, if you want to call it a wage loss, would not exist but for his retirement. As we know from the other cases that have come down as well as the most recent perhaps and talk about his cases, these wage differentials were never intended to be for life. They were never intended to last for the duration of the disability. In this case, the disability he was awarded was an economic disability. You say the disability he was awarded was an economic disability, but that's not what the Rule 23 says. The Rule 23 says there was sufficient factual evidence from which the Commission could reasonably infer that the claimant suffered a partial impairment of the function of his body. You say solely on economic disability, you're talking about physical disability. There was evidence in the record that would have supported such a holding. And indeed, if my recollection is correct, the award originally made in this case by the arbitrator was a small percent of a man. That was then changed to an award for a wage differential which this Court affirmed in a Rule 23 order. The disability being that because of his occupational disease, he was prevented from returning to that environment where that hazardous exposure was present. When you look at the Commission's final decision, I think it was a corrected decision, opinion on review, there's absolutely no mention of an award being made for anything other than economic disability. Of any functional impairment. And I would point out that in Section 1E of the Occupational Disease Act, it defines disablement not as and or a functional impairment and or an economic disability. They defined it as or. Either a functional impairment or an economic disability. There is no issue that remains here other than do we have to look at the economic disability, if you will, as that term is defined in this case and apply it because that's the way the term is defined in the Occupational Disease Act. In this case, this gentleman's economic disability, if you will, ended when he retired at age 62. I completely agree Oh, I'm sorry. You can finish your sentence. I completely agree with the appropriateness of wage differentials because the act is humane and it's intended to make people whole and we should do that. But they should not be given a windfall either. Thank you, Counsel. The Court will take the matter into advisement for disposition.